## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ANTHONY J. QUARTARONE,                )
Individually, and ANTHONY J.          )
QUARTARONE, as next of friend of      )
MARIO QUARTARONE, a minor,            )       C.A. No.  04-380 (SLR)
                                      )
        Plaintiffs,                   )
                                      )
    v.                                )
                                      )
KOHL'S DEPARTMENT STORES, INC.        )
a Delaware Corporation.               )
                                      )
        Defendant                     )

## APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
302-472-4900
Attorney for Plaintiff

DATED:  April 18, 2005

# TABLE OF CONTENTS

|  | Page No. |
|---|---|
| Complaint | A-1 |
| Answer | A-5 |
| Case Report | A-10 |
| Check | A-11 |
| Evens & Associates Bill | A-12 |
| Affidavit of Gary W. Aber | A-13 |
| Transcript Pages |  |
|     Markson | A-17 |
|     Twisler | A-35 |
|     Quartarone | A-42 |
| Unreported Cases |  |
|     Taylor v. Wolhar and Moore, P.A._ 1985 WL 552278 (Del.Super.) | A-61 |
|     Wilson v. Drafter-King Cole, Inc._ 1986 WL 3638 (Del.Super.) | A-63 |

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

FILED
PROTHONOTARY

2004 MAR 12  PH 3: 45

**IN AND FOR NEW CASTLE COUNT**

| | | |
|---|---|---|
| ANTHONY J. QUARTARONE,<br>Individually, and ANTHONY J.<br>QUARTARONE, as next of friend of<br>MARIO QUARTARONE, a minor, | ) ) ) ) | |
| | ) | C.A. No. |
| Plaintiffs, | ) ) | Arbitration Case |
| v. | ) ) | Trial By Jury Demanded |
| KOHL'S DEPARTMENT STORES, INC.<br>a Delaware Corporation. | ) ) ) | |
| Defendant | ) ) | |

## COMPLAINT

## COUNT I

1.    The plaintiff, Anthony Quartarone is a resident of New Castle County, Delaware.

2.    The plaintiff, Mario Quartarone, is a minor, who resides in New Castle Count, Delaware, with his father, the plaintiff, Anthony Quartarone. At the time of the events described herein he was nine (9) years old.

3.    The defendant, Kohl's Department Stores, Inc., is a corporation organized and existing under the laws of the State of Delaware, whose agent for service of process is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

4.    This Court has jurisdiction under the provisions of 42 U.S.C. §1981.

5.    Both plaintiffs are of Hispanic nationality.

6.    The defendant is at all times hereinafter mentioned was the owner of and in position and control of a retail establishment known as Kohl's Department Store, located on Route 202, Concord Pike, New Castle County, Delaware.

7.    In operating the retail establishment described in ¶6, defendant extended to the public its accommodations, advantages, and privileges and invited thereto any all persons desiring its accommodations, advantages and privileges.

8.    In March 2002, the plaintiffs entered the defendant's establishment for the purpose of purchasing merchandise, including shoes and clothing for the minor plaintiff.

9.    After shopping in the store, the plaintiffs entered the cashier's line at Kohl's and proceeded to pay for the merchandise they had selected, totally in the amount of $171.95. Payment for that merchandise was made by check.

10.    The check which paid for the merchandise referred in ¶9 had the plaintiff, Anthony Quatarone's name, address, and telephone number printed upon it.

11.    After paying for the merchandise referred to in ¶9 as the plaintiffs were leaving the store and were stopped by security personnel employed by the defendant. At that time, they were informed that the minor plaintiff was wearing a pair of shoes for which they had not paid.

12.    The plaintiffs were taken by agents of the defendant to an interior room and there the defendants wrongfully accused the plaintiffs of stealing the shoes that were being worn by the minor plaintiff.

13.    After the plaintiffs were taken to the interior room of the store, the adult plaintiff, Anthony Quatarone, explained that he had forgotten the minor plaintiff was wearing the shoes and promptly offered to pay for them.

14.    After being held in excess of two hours, by the defendants, at the insistence of the adult plaintiff, Anthony Quatarone, the defendants summoned the Delaware State Police, and the defendant had the plaintiff arrested and charged with criminal conduct.

15.    During the time that the plaintiffs were in the store, the defendant was having the plaintiffs survieled by video camera, in part, because of their Hispanic appearance.

16.    The defendants brought criminal charges against the adult plaintiff in the Court of Common Pleas, which resulted in a criminal trial, State of Delaware v. Anthony Quatarone, Criminal Action No.: 02-03-010446.

17.    At the time those criminal charges were brought there was no cause to believe that there was criminal intent or that a criminal act had occurred.

18.    The actions of the defendants in continuing to prosecute the plaintiffs were malicious.

19.    On February 4, 2003 the Court of Common Please for the State of Delaware, entered a finding of "Not Guilty" on the charges brought by the defendant.

20.    The actions of the defendant prevented the plaintiffs from contracting with the defendants in the same manner as white citizens, and as such constituted a violation of 42 U.S.C. §1981.

21.    The plaintiffs have suffered damages as a result of the actions of the defendants, in that large sums of money were required to be spent for the defense of the criminal charges brought against them.

22.    The plaintiffs have suffered great pain, suffering and humiliation as a result of the actions of the defendants.

## COUNT II

23.    The plaintiffs incorporate herein and make a part hereof the allegations contained in paragraphs 1 through 22.

24.    The defendants instituted criminal proceedings against the plaintiffs, maliciously, when no probable cause existed to support such criminal proceedings.

25.    The criminal proceedings commenced and prosecuted on behalf of the defendants terminated with a "Not Guilty" in favor of the plaintiffs.

**WHEREFORE,** the plaintiffs demand judgment against the defendants in such amount as this Honorable Court shall award, to include both compensatory and punitive damages.

ABER, GOLDLUST, BAKER & OVER

GARY W. ABER (DSB #754)
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiff

DATED: March 12, 2004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANTHONY J. QUARTARONE,<br>Individually, and ANTHONY J.<br>QUARTARONE, as next friend of<br>MARIO QUARTARONE, a minor,<br><br>Plaintiffs,<br><br>v.<br><br>KOHL'S DEPARTMENT STORES, INC.,<br>a Delaware corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. |

## ANSWER

Defendant Kohl's Department Stores, Inc. ("Kohl's" or "defendant"), by and through its undersigned counsel hereby responds to the allegations of the Complaint as follows:

1.      Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

2.      Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

3.      The allegations of this paragraph are admitted.

4.      The allegations of this paragraph state legal conclusions to which no response is required.

5.      Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

6.      The allegations of this paragraph are admitted.

7.      The allegations of this paragraph are admitted.

8.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

9.    Defendant admits that plaintiffs paid for certain merchandise they had selected and that payment for that merchandise was made by check. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations of this paragraph, but its investigation is ongoing.

10.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, but its investigation is ongoing.

11.    Defendant admits that Kohl's security personnel stopped plaintiffs when they attempted to exit the store with a pair of shoes for which they had not paid. The remainder of the allegations of this paragraph are denied.

12.    Defendant admits that plaintiffs were escorted to an interior room within the store so that Kohl's security personnel could investigate their reasonable suspicion that plaintiffs had been shoplifting. The remainder of the allegations of this paragraph are denied.

13.    The allegations of this paragraph are denied.

14.    Defendant admits that the Delaware State Police were called to the Kohl's location and placed plaintiff Anthony Quartarone under arrest. The remainder of the allegations of this paragraph are denied.

15.    The allegations of this paragraph are denied.

16.    Admitted that plaintiff Anthony Quartarone was charged and tried for shoplifting in the New Castle County Court of Common Pleas for the State of Delaware. The remainder of the allegations of this paragraph are denied.

17.    The allegations of this paragraph are denied.

18.    The allegations of this paragraph are denied.

19.    Defendant admits that the Court of Common Pleas for the State of Delaware entered a finding of "not guilty" on the charges of shoplifting asserted against plaintiff Anthony Quartarone. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations of this paragraph, but its investigation is ongoing.

20.    The allegations of this paragraph are denied.

21.    The allegations of this paragraph are denied.

22.    The allegations of this paragraph are denied.

23.    Defendant incorporates herein its responses to the allegations of paragraphs 1 through 22.

24.    The allegations of this paragraph are denied.

25.    The allegations of this paragraph are denied.

### FIRST AFFIRMATIVE DEFENSE

26.    Plaintiff fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

27.    Defendant's acts, practices, and policies have at all times been necessary to the orderly and efficient continued operation of its business.

### THIRD AFFIRMATIVE DEFENSE

28.    Defendant's conduct toward and treatment of plaintiffs was at all times based upon reasonable, legitimate, and non-discriminatory business reasons.

## FOURTH AFFIRMATIVE DEFENSE

29.    Some or all of plaintiffs' claims are barred by the applicable statute of limitations.

WHEREFORE, Defendant Kohl's Department Stores, Inc. respectfully requests that this Court enter judgment in its favor and against plaintiff:

(a)    Dismissing the complaint with prejudice;

(b)    Awarding it costs and attorneys fees; and

(c)    Granting such other and further relief as the Court deems just and proper.

POTTER ANDERSON & CORROON LLP

By: _Sarah E. DiLuzio_
    Kathleen Furey McDonough (I.D.# 2395)
    Sarah E. DiLuzio (I.D. # 4085)
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    Telephone: (302) 984-6000
    Telefax: (302) 658-1192
    Attorneys for Defendant,
    Kohl's Department Stores, Inc.

Dated: June 16, 2004
638508/28168

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2004, two copies of the attached Answer were

served by hand on plaintiffs' counsel of record at the address indicated:

> Gary Aber, Esquire
> Aber, Goldlust, Baker & Over
> 708 King Street
> Suite 600
> Wilmington, DE 19899

_Sarah E. DiLuzio_
Sarah E. DiLuzio

638508/28168

# KOHL'S

## CASE REPORT

CASE NO. 271-02-001

| DATE OF INCIDENT: | DAY OF INCIDENT: | TIME OF INCIDENT: | TYPE OF INCIDENT: SHOPLIFTING ☒  OTHER ☐ | ☐ JUV. | RECOVERY: |
|---|---|---|---|---|---|
| 3/9/02 | Saturday | 17:50  A.M. / ☒P.M. | | ☒ ADULT | $ 44.99 |

| SUBJECT'S NAME: LAST, FIRST, MIDDLE | ADDRESS: |
|---|---|
| Quartarone, Anthony J | 503 Boxborough Dr. |

| | CITY: | STATE: | ZIP CODE: |
|---|---|---|---|
| ☐ ALIAS/NICKNAME ☐ MAIDEN NAME  N/A | Wilmington | DE | 19810 |

| SOCIAL SECURITY NO.: | DRIVER'S LIC. NO./STATE: | RACE: | SEX: | D.O.B.: | AGE: | HT.: | WT.: | HAIR: | EYES: |
|---|---|---|---|---|---|---|---|---|---|
| N/A | 1163470 | Hisp. | M | 4/10/61 | 41 | 5'10" | 167 | Brw. | Brw. |

| OTHER I.D.: | SCARS/MARKS, OTHER FEATURES: | CLOTHING WORN: |
|---|---|---|
| N/A | N/A | Blue Jeans  KISS 101 Jacket  Gray Shirt  Black Sneakers |

| PARENT'S NAME: (IF JUVENILE) | OCCUPATION/SCHOOL (IF JUVENILE): | HOME PHONE: 529-1693 |
|---|---|---|
| N/A | KISS 101.7 FM Owner/GM | BUSINESS PHONE: |

| TIME OF REPORT: | LOC. SUBJ. OBSERVED: | TIME SUBJ. FIRST OBSERV. | LOC. OF CONCEALMENT: | LOC. APPREHENDED: |
|---|---|---|---|---|
| 8:00 3/11  ☒A.M. / P.M. | Shoe Dept. | 16:40  A.M. / ☒P.M. | On Child's feet | Front of Store  Misses Sidewalk |

| SUBJ. RESISTED: In LP office ☒ YES, ☐ NO | TIME OF APPREHENSION: 17:50  A.M./ ☒P.M. | TIME IN OFFICE: 17:53  A.M./ ☒P.M. | TIME OUT OF OFF./REL.: 18:30 | WEAPONS RECOVERED: TYPE: N/A |
|---|---|---|---|---|

| HANDCUFFS USED: ☐ YES ☒ NO | AMT. MONEY/CHG. CARDS, ETC. ON PERSON $ N/A | PHOTOGRAPHS TAKEN OF/BY: ☐ SUBJECT ☒ MERCHANDISE Twisler | KOHL'S CHARGE RECOVERED ☐ YES # _____ ☐ NO  N/A |
|---|---|---|---|

| APPREHENDED BY: Markson Twisler | ADDITIONAL WITNESSES: (INCLUDING WITNESS IN OFFICE) 1) Michelle Goldstein   3) Jesus Colon 2) Jesse Arena   4) |
|---|---|

| COMPANION CASE: N/A | CASE NO. N/A | COMPANION CASE: N/A | CASE NO. N/A |
|---|---|---|---|

| | PARENTS CALLED: N/A  A.M./P.M. | POLICE CALLED: 18:00 A.M. 18:15 ☒P.M. | POLICE DEPT. DSP |
|---|---|---|---|
| | PARENTS ARRIVED/LEFT  N/A  A.M./P.M. | POLICE ARRIVED/LEFT 18:20 A.M. 18:30 ☒P.M. | OFFICER'S NAME/BADGE: 1. Lewis 2. Fuscellero |
| | ☐ RELEASED ☒ PROSECUTED | | SIGN. PARENT/GUARDIAN N/A |
| | CHARGES FILED BY: Kohl's | MISD. ☒ FEL. ☐ | PROSECUTOR: |
| | COURT CASE NUMBER: 0203010446 | | COURT LOCATION/CITATION: |
| | L.P.S./L.P.M. APPROVING DISP.: Twisler | | D.L.P.M. APPROVING DISP.: Swanson |
| | PREPARED BY/DATE: _____ 3/11 | | REVIEWED BY/DATE: |

DEP 1163470

ANTHONY J. QUARTARONE
503 EAST ROXBOROUGH DR
WILMINGTON, DE 19810

2185

599-1693

62-780
312
660017333

DATE 3/9/02

PAY TO THE
ORDER OF _Kohls Department Store_                    $ 171.95

_One Hundred & Seventy one Dollars & 95/100_    DOLLARS

030247536  412  28  527S  5272

Commerce
Bank

America's Most Convenient Bank®
1-888-751-9000

MEMO

⑈031207801⑈ 66 001739 3⑈ 2185  ⑈0000017195⑈

FRB-PHILA*RC PC-GROUP      0271676870
030247536  03-10-0004-0    03/13/2002
030247536  03-13-02

Account:660017393  Check#:2185  Amount:$171.95  Date Presented:03-13-2002

# EVANS & ASSOCIATES

*Attorneys at Law*

TWO MILL ROAD
SUITE 200
POST OFFICE BOX 550
WILMINGTON, DE 19899-0550
(302) 655-5025

DONALD ELIHU EVANS*

WRITER'S DIRECT LINE
(302) 655-8807

FAX: (302) 655-5441

* Also Admitted in PA

E-MAIL: devans@evanslawonline.com

SAM Y. HWANG
OF COUNSEL

**PHILADELPHIA OFFICE**
One Penn Center, Suite 800
1617 JFK Boulevard
PHILADELPHIA, PA 19103
(215) 790-5100
FAX: (215) 790-8300

February 11, 2004

**Mr. Anthony Quartarone**
**503 East Boxborough Drive**
**Wilmington, DE 19810**

Re: Our File No.: 7029 M 001

Full and Final Billing Statement

*For Services Rendered In The Matter Of:*     ***State v. Anthony Quartarone***

*for the period beginning:* March 11, 2002 *and ending:* February 4, 2003

Review and analysis of applicable statutes, issues, documents, discovery, subpoenas, legal research; review and analysis of videotapes, review Court file and documents produced; various discussions and teleconferences with Tony Q., prosecutor, and prospective witnesses; Court appearances including Motion to Preserve tapes and records; argument on prosecutors request for continuance and on postponement, trial preparation and attendance (two sessions), witness preparation and arguments. Costs and expense disbursements*: postage, copies, and fax charges, $ 26.42.

| | |
|---|---|
| Law Clerk/Case Manager | 29.2 hrs. |
| (39.2hrs, reduced to 29.2) | |
| Attorney | 24.7 hrs. |

| | |
|---|---:|
| *Fees Total :* | $ 11,060.50 |
| *Costs advanced* of :* | $ 26.42 |
| *Less Retainer received :* | ($ 2,500.00) |
| *Balance Due as of 10/31/03 :* | $ 8,586.92 |
| *2% Interest as of 2/29/04:* | $ 514.20 |
| *Total Balance Due Immediately:* | $ 9,101.12 |

*Payment Terms: Due Upon Receipt*
*2% per Month After 30 Days*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

ANTHONY J. QUARTARONE,                      )
Individually, and ANTHONY J.                )
QUARTARONE, as next of friend of            )
MARIO QUARTARONE, a minor,                  )        C.A. No.  04-380 (SLR)
                                            )
          Plaintiffs,                       )
                                            )
     v.                                     )
                                            )
KOHL'S DEPARTMENT STORES, INC.              )
a Delaware Corporation.                     )
                                            )
          Defendant                         )

**AFFIDAVIT OF GARY W. ABER**

STATE OF DELAWARE          )
                           ) SS.
COUNTY OF NEW CASTLE       )

I Gary W. Aber, being duly sworn according to law do depose and say:

1.     I am the attorney representing the plaintiff in the above-captioned matter.

2.     I have viewed a surveillance film used as evidence in the criminal case brought against the plaintiff herein in the Court of Common Pleas for the State of Delaware.

3.     In viewing that surveillance film, which was approximately 30 to 40 minutes long, only three (30) persons are surveilled on the film, the plaintiff, the plaintiff's Hispanic friend, and one black male.  No Caucasian's were surveilled at that time.

ABER, GOLDLUST, BAKER & OVER

GARY W. ABER (DSB #754)
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE 19899
(302) 472-4900
Attorney for Plaintiff

DATED: April 18, 2005


SWORN TO AND SUBSCRIBED before me, a Notary Public, of the State and County

aforesaid, this 18 day of April, 2005.

NOTARY PUBLIC

A-14

# IN THE COURT OF COMMON PLEAS

## FOR THE STATE OF DELAWARE

| | |
|---|---|
| STATE OF DELAWARE, | ) |
| | ) Trial - February 4, 2003 |
| v. | ) |
| | ) Criminal Action No. 0203010446 |
| ANTHONY J. QUARTARONE, | ) |
| | ) Volume II |
| Defendant. | ) |

**BEFORE:**

### HONORABLE JOHN K. WELCH

**APPEARANCES:**

> RICHARD R. WIER, ESQ.
> for the State
>
> DONALD E. EVANS, ESQ.
> for the Defendant

### TRANSCRIPT OF TRIAL

A~15

point, but as far as you're concerned, he's got the black sneakers on --

A.      Correct.

Q.      -- he puts the old box on top of the cart.

A.      I believe that box, I mean, I can't say for sure, but I believe

that box may be the --

Q.      A box, he puts a box on top of the cart.

A.      -- the first pair that he tried on.

Q.      Okay.  And they continue to, to browse some more.

So you have constant surveillance on...  I'm just trying to

fast-forward to make sure -- to try to expedite this.  And you have Mr.

Quartarone...

Is there any way to fast-forward this so it doesn't go so fast?

He still has the black shoes on, correct?

A.      Correct.

Q.      And I think that's probably -- is that a close-up of, what is

that a close-up of?

A.      The fact that he still has the shoes on his feet.

Q.      Okay.  And let's go back.  What's that, what's that in the, in

the cart?

Markson - direct                                                27

sneakers in the cart.  And Mr. Quartarone is shopping in the young men's

department.

Q.     Okay.  And just to -- I'm just going to stop it right there.

       If you can just tell the, tell the Judge from, from that point on,

in your, from watching the video, so we don't have to go through the whole

thing again, what, what happened?

A.     Mr. Quartarone tried on several pairs of jeans in and out of

the fitting room.  After selecting the clothing that he wanted, him and his

son walked back to the sports apparel department, which is located across

from the shoe department, where Mr. Quartarone took the Nike box out of

the cart, went across the shoe department and put that on a shelf; at which

time, he returned to where his son and the cart were, and they went up to

the registers.

Q.     So he took, he took the Nike box?

A.     The Nike box that was in the cart, he took out of the cart and

placed it on a shelf in the shoe department.

Q.     Maybe we should go to that.

       Do you know approximately where that is right here

(indicating)?

Markson - direct                                28

A.    It's --

Q.    And there's not that much left.

A.    -- I guess it's probably about eight or ten minutes that they were trying on pants prior to them...

Q.    Well, I'm going to leave it that that's your testimony.

And what happened when they arrived to the, at the cashier?

A.    They put the jeans, the denim that they had, they put the sneakers, or the other shoes that were in the cart, up on top of the counter. They, you know, items were scanned, a check was written out for the items.

Q.    Do you know approximately how much?

A.    I don't recall what the exact price was, no.

After they walked away...

Q.    Was it over a hundred dollars --

A.    Yes.

Q.    -- under two hundred dollars, probably, maybe?

A.    If memory serves, it was between a hundred and two hundred.

Q.    Okay.

A.    More than one hundred, less than two hundred.  I couldn't

you know, and asked them to return into the store.  At which time, they

came back in without, without incident.  There was, you know, no hostility,

anything at that point, they cooperated.

We returned to the Loss Prevention office.  Once we were

inside the Loss Prevention office, you know, I started to say, the reason

that we brought you back here isn't -- Manuel jumped in and said because

of the shoes.  Then I proceeded from there.

Q.    And how, what was Mr. Quartarone's --

A.    Mr. Quartarone...

Q.    -- behavior?

A.    At first he was cooperative.  You know, he explained that,

tried to explain that it was an accident and he forgot.  That, you know, it

was hot in the store.  That after running around and trying all the stuff on,

he was sweaty, and they just wanted to get out of the store, that it had

completely slipped his mind.

Mr. Twisler, you know, said that our original intention wasn't

to prosecute, we just wanted to, you know, recover the store's, you know,

take care of our paperwork, and then have, you know, release Mr.

Quartarone into his own custody.

you saw --

A.    Correct.

Q.    -- from the cameras, correct?

A.    Correct.

Q.    Okay.  What's your date of birth, sir?

A.    July 6, 1972.

Q.    So you're...

A.    Thirty.

Q.    Okay.  You were asked at the early part of the review of the

tape whether there was a segment of the tape that looked at other people.

My recollection of what I saw at that point, was there was a black male

with a red shirt or jacket that was being viewed on the tape, is that your

recollection?

A.    Correct.

Q.    And is that the person you characterized as jumpy --

A.    Yeah.

Q.    -- in your testimony?

A.    Yes.

Q.    In fact, that's the only other person that was really being

Markson - cross                                                36

observed on the tape, other than Mr. Quartarone, his son and his

companion, correct?

    A.    Correct.

    Q.    You testified at the end of your review of the tape that there

was a box that had been in the cart; I believe it was an orange and tan box

by my recollection, is that correct?

    A.    Umm...

    Q.    That was taken and put, put --

    A.    Correct, that would be...

    Q.    -- on top of a shelf right before he went through checkout?

    A.    Correct, that would be the Nike box.

    Q.    A Nike box.

    Were you aware that that was a full box with shoes in it?

    A.    Yes.

    Q.    So it was not a box, the empty box that the shoes his son had

on him, it was not --

    A.    No, it was --

    Q.    -- that box he was hiding, correct?

    A.    -- not, it was not.  To my recollection, when Manuel had

Markson - cross                                    43

Q.    And eventually you changed your mind, apparently?

A.    Yes, because Mr. Quartarone became upset, did not want to

cooperate. Didn't -- at that point, you know, as time went on he was less

and less cooperative, continued to deny the fact that, you know, he

intentionally took them, that he forgot, that he was hot. And at one point,

stood up, throwing his jacket down, saying this is bullshit, and actually

making sort of a lunge effort towards my supervisor, where Manuel had

actually stepped in and grabbed him and said, sit down.

Q.    Well, in fact, the cooperation you wanted from him was for

him to admit that he intended to take shoes, whether or not he did, and

that he should be photographed as a shoplifter, and what else?

Is that true, first of all, what I just said?

A.    Ah...

Q.    That's cooperation, right; that's what you wanted from him?

A.    That would be cooperation. But we just needed to be able to

get the information, you know, name, address, telephone number, you

know, things that we need that our case reports ask for.

Q.    Well, you had his name, address, phone number, checking

account number, driver's license number...

Markson - cross                                        44

A.     We didn't have possession of the check at the time.  It was in the cash register.

Q.     Well, we, you mean you and Mr. Twisler in the room --

A.     Correct.

Q.     -- didn't have them --

A.     Correct.

Q.     -- but you saw on the tape or you would have been able to see on the tape, and talked --

A.     Uh-huh.

Q.     -- when you talked to the cashier, that he paid by check, that he, that his, he had to give a license to pay by check, and that Kohl's had all that information, did it not?

A.     Correct.

Q.     Is that the kind of behavior that people that steal things usually do, provide instant means of clearly identifying themselves to the cashiers --

A.     Ah...

Q.     -- in your experience?

A.     From time to time, yes.  I've had people...

Markson - cross                                    **45**

Q.      Common; is it common?

A.      Well, if you would like me to, to give you an example, I'd be more than happy to.

Q.      No.

A.      Okay.

Q.      Is it common --

A.      It's not common.

Q.      -- for people to identify themselves like that?

A.      No, it's not common.

Q.      Is it common for them to go through the cash, cashier's with a twenty-two dollar pair of sale shoes on a child's feet, or supposedly in your view, seeking or intending to take something worth twenty-two dollars, then go through the cashier's line and spend a hundred and seventy dollars or so?

A.      Not common, but not unheard of.

Q.      Not... Well, how many times have you had that kind of thing happen; when you had somebody that you actually apprehended and actually --

A.      Once or twice.

53

building.  That would be Kohl's ethical standards.

Q.    And then once that's been done, and in your view, or you or your supervisor's view, if you believe that there's been a concealment and that there's been a --

A.    And if there's been intent.

Q.    -- departure with property that was intentional, that someone intended to steal it, then, then they've shoplifted, in your mind, and they get an admonition and they're not supposed to come back, right?

A.    Correct.

Q.    But if that wasn't their intent, can you understand why somebody might be, at a minimum, reluctant to sign an admonition?

A.    I can understand that.

Q.    And, and is it reasonable why one of your customers in this situation, or Mr. Quartarone in this specific situation, might have construed your insistence on an admonition and being photographed as his admitting that he intended to ever take something?

A.    I can understand that, but you're asking me to look at this through Mr. Quartarone's eyes, and I'm not Mr. Quartarone.

Q.    Well, no, I'm just asking you --

Q.    How many times did he do that?

A.    How many times did Mr. Quartarone say that?

Q.    Uh-huh.

A.    Probably two or three times.

Q.    And about what point in this hour that you kept him did he do that?

A.    I believe it was towards the later part of it.

Q.    Was he agitated at the time?

A.    Yes.

Q.    Is it normal for suspected shoplifters to ask the store security personnel to call the police, in your experience?

A.    I've never had it done to me.

Q.    Okay.  A couple of more questions, I think.

You testified that Mr. Quartarone kept claiming that he was, he didn't do anything wrong and it was an accident, it was a mistake, it was an oversight, he was just leaving the store, he didn't realize, right, words --

A.    Correct.

Q.    -- to that effect?

Markson - cross                                75

MR. EVANS:   Okay.

THE COURT:   -- if there's an objection, I can rule on it.

BY MR. EVANS:

Q.   I'll represent to you that her statement says on the, on the second page, he was willing to cooperate by either just paying for the shoes or just returning everything and leaving; does that sound right to you?

A.   I recall him saying that, yes.

Q.   Okay.  And it says, the other thing in her statement, is that he took off his son's shoes, and to prove that the shoes he was wearing were too small, stating that they were too small, and that the new shoes he would be glad to pay for them; sounds correct to you?

A.   That sounds correct.

Q.   And another person was Jesus Colon, the other -- third person that also made a statement, a short statement, was Jesus Colon?

A.   Correct.

Q.   All right.  And that is in the same category as the other people's statements.  You reviewed it since the incident, not recently, right?

A.   Yes.

Q.   I'll represent to you that Mr. Colon's statement says that Pat,

Markson - cross                                    **76**

that would be Mr. Twisler, I presume --

A.    Correct.

Q.    -- asked the men to be honest, but was consistently saying that

he mistakenly or accidentally forgot about the shoes, is that correct?

A.    Correct.

Q.    Okay.  Have you looked at the, the check that was used --

A.    No, I have not.

Q.    -- to pay for the merchandise at all?

A.    No.

MR. EVANS:   I have one more document, the last document

I want to show this witness, Your Honor, so I guess I should mark it first...

THE COURT:   You can mark it as two.

MR. EVANS:    Your Honor, I understand from counsel

there's no objection to this being admitted as an exhibit --

MR. WIER:   There's no objection to that.

MR. EVANS:    -- and have marked...

THE COURT:   Just mark it Defendant's 2 received into

evidence without objection by the State.

(At this time a copy of a Check was admitted as Defendant's

Markson - cross                                           77

Exhibit No. 2 into evidence.)

         MR. EVANS:    Your Honor, I've provided an extra copy to,

to the Court for reference.  I'm going to hand the marked copy to the

witness.

         THE COURT:    Thank you.

BY MR. EVANS:

    Q.    Mr. Markson, you've already testified you didn't look at the

check that was paid at the time.  Are the markings on the check that you

have before you -- first of all, that check that you have before you, I guess

you've never seen before, correct?

    A.    No, I have not.

    Q.    Has, has Anthony J. Quartarone at the printed heading on

that check, does it not?

    A.    Correct.

    Q.    It's dated March 9th, 2002, is it not?

    A.    Correct.

    Q.    That would be the date of this incident, correct?

    A.    Correct.

    Q.    It's in the amount of $171.95, correct?

A.    That's what it says.

Q.    And it has the front and back of the check --

A.    Correct.

Q.    -- so the check was canceled and processed through the Federal Reserve Bank in Philadelphia, and it was endorsed by Kohl's, was it not?  Can you see that?

A.    Yeah, it looks like it was franked to a register.

Q.    Okay.  That looks like a register...  That's what I was going to ask you.

A.    Yeah, it would have been franked through the register when he went up there.

Q.    Did you say franked?

A.    Well, that's what they call it.  It's what, I guess the cashier terminology is for when they actually put it into the register and it imprints it.

Q.    Okay.  So this would have been what, apparently what Mr. Quartarone used to pay for the merchandise he purchased at the cashier you all talked to, correct?

A.    That's correct.

Q.    And it also has on the front of the check, DE, number symbol,

Markson - cross                                                    79

1163470.  I would interpret that to mean --

    A.    His driver's license number.

    Q.    -- Delaware driver's license.  And 529-1693, I would interpret

that to be probably his phone number, right?

    A.    Correct.

    Q.    And it is customary for the cashiers, for security reasons,

when they take a check, to keep that kind of information so you can find

them if the check bounces?

    A.    Yes, it is.

    Q.    So if I asked you if you thought that this was what Mr.

Quartarone used to pay for his merchandise that he bought that day,

would you agree with that?

    A.    Yes.

    Q.    Okay.

        MR. EVANS:   I don't have any more questions about this

exhibit.  I hand it back to the clerk.

        THE COURT:   Thank you.

        MR. EVANS:   I think I'm almost done, Your Honor.  If I

can just check my notes briefly, please.

Quartarone - direct                                    125

Q.    Okay.

A.    At that point, they found nothing in there, and I said, now

what are we waiting for.  And they says, well, we're going to call, we're

waiting for an answer from our supervisor.  And I said, okay, and I sat

back down, trying to calm down Mario.  The store's office general

manager was asking to take Mario out of the room, because he was

hysterical, crying, and he didn't want to go with them.  During this whole

time, my son is hysterically crying, that something bad's going to happen.

At that point, we're going on forty minutes, forty-five

minutes.  The supervisor supposedly still has not called back, after they

told me that they had paged their supervisor.  At that point, I said, do me a

favor, this is getting so ridiculous, I want the police here.  Because once the

police come and they hear my side -- which that's what I thought would

happen.  I had no idea that the second they got there they would handcuff

me and, and take me off to jail.

Q.    Well, did they talk to you, the police, when they got there?

A.    No.

Q.    Oh.  So...

A.    They spoke to them, but not, not to me.

Quartarone - direct                    126

Q.    Okay.  And that all took about how long?

A.    Over two and a half hours.

Q.    Including being at the police station and all that?

A.    No.  I was at the police station till 1:00 o'clock in the morning.

Q.    So from 5:00 or 6:00 o'clock until 1:00 o'clock in the morning, you were being processed at the police station.  I mean, you were first being processed by --

A.    Two hours at Kohl's --

Q.    -- the Kohl's...

A.    -- being there two hours in Kohl's.  And then by the time we got into the, the police station, it was almost 8:00 o'clock at night.  From 8:00 o'clock at night till 1:00, 1:30 in the morning.  'Cause I had to go on this video TV and speak to the judge on video camera --

Q.    Uh-huh.

A.    -- and --

Q.    That's what the judge looks at (indicating), yeah.

A.    -- and, and --

Q.    Uh-huh.

A.    -- basically plead...

# IN THE COURT OF COMMON PLEAS

## FOR THE STATE OF DELAWARE

| | |
|---|---|
| STATE OF DELAWARE, | ) |
| | ) Trial - December 10, 2002 |
| v. | ) |
| | ) Criminal Action No. 0203010446 |
| ANTHONY J. QUARTARONE, | ) |
| | ) Volume I |
| Defendant. | ) |

**BEFORE:**

### HONORABLE JOHN K. WELCH

**APPEARANCES:**

> RICHARD R. WIER, ESQ.
> for the State

> DONALD E. EVANS, ESQ.
> for the Defendant

## TRANSCRIPT OF TRIAL

us or tell the Court where you were on that day?

    A.    I was working at the Kohl's Department Store, 271, which is the location that I just gave.  I was working that day from 2:00 till 10:00 o'clock at night.

    Q.    Okay.  And where, where do you normally spend your time in the, in the Kohl's Department Store?

    A.    Usually in the office.  We have an extensive camera system in the store.  Also, though, we do circulate around the store as customers in the store, pose as customers.

    Q.    And did you receive training in operating the camera equipment --

    A.    Yes.

    Q.    -- surveillance equipment?

    A.    Yes.

    Q.    What kind, do you know what kind of equipment that is?  Are, are...

    A.    It's --

    Q.    Is it...

    A.    -- a checkpoint surveillance system.

Twisler - direct                                    29

A.    Yes.

Q.    -- and you could still see the young boy with the shoes on his feet?

A.    Correct.  And there was no effort to purchase these shoes, there was no box to represent, or a price tag to represent the shoes that were located on his feet, on his son's feet.

Q.    Okay.  And then what happened?

A.    Shortly after, at approximately 5:50, Mr. Quartarone, and Mr. Mena and the unidentified juvenile exited the building via the misses department entrance.  Loss Prevention Officer Mike Markson, who's present today, approached both subjects directly outside the misses entrance.  He identified himself as Kohl's Loss Prevention or Kohl's Security, and asked the subjects to return to the building.

Mr. Quartarone and Mr. Mena returned to the LP office without incident.  Once in the LP office I requested some witnesses to accompany us in the office.  Mr. Quartarone immediately began saying, it was a mistake, I work for a radio station, I'm a federal officer, I'm going to contact a lawyer; all those quotes, all those statements are in my report here.

I then contacted my boss, District Loss Prevention Manager

Twisler - direct                    32

$44.99 for one pair of Nike children's sneakers.

Q.    How many hours a day do you, do you spend watching these surveillance tapes, approximately?

A.    Approximately, on the average day we'll spend between six and seven hours observing customers throughout the store, based on suspicious activity.

Q.    And in your opinion, did Mr. Quartarone intend to, to steal, to shoplift these, these shoes?

A.    I believe so.  After working for two and a half years --- Mr. Quartarone looked for three areas to con, to place back the old shoes that, were previously located on his son's feet.

Mr. Quartarone was informing myself that it was hot in the store, I forgot.  He consciously looked for three places to conceal or put back the old sneakers that were previously on his son's feet.

Q.    And do you think he, he forgot at all, you know, to pay for them?

A.    No.

MR. EVANS:    Objection, Your Honor.  I don't think he has a clue what he thought.

LASER BOND FORM A    ⊕    PENGAD • 1-800-631-6989 • www.pengad.com

Twisler - cross                                    38

Q.     That is when he walked in the door, he was a suspected

shoplifter; that's why you watched him from the time he got there until,

until the time he paid for his merchandise, correct?

A.     He had a KISS 101.7-FM jacket on, which stuck out in my

memory.

Q.     All right.

A.     I remembered him being in the store before and, yes, I found

tags around the building after, where he was located, and, but there was

not enough evidence at that time for me to make an apprehension.  So I,

what we all do when someone comes in and we believe that they possibly

have stolen, but we don't have enough evidence to apprehend, we save that

in our memory, we save that based on pictures that we have of the subjects

in the store and videotape.

Q.     Let's talk about this case.

       What pictures did you have of Mr. Quartarone from previous

visits?

A.     None --

Q.     No.

A.     -- but the, but the...

Twisler - cross                                    39

Q.    What video -- excuse me.  What videotapes did you have of
Mr. Quartarone from prior occasions?

A.    None.

Q.    So you had a recollection in your mind that this man who
came in, who was initially on your records reflected as a Hispanic man, in a
KISS 101.7 black jacket, was the guy you think you saw some time before
this, correct?

A.    Yes.

Q.    But you're not sure of that, are you?

A.    I am certain.  That's why I --

Q.    You're certain it was Mr. Quartarone?

A.    -- that is why I informed...  It was very busy in the store that
day.  We could have watched several other people.  But I saw this person in
a KISS 101 jacket and I said to Mr. Markson, he's been in here before, we
need to watch this, this subject.

Q.    You've got to watch out for the 101.7 jackets, right?

A.    It's not just all based on the 101.7 jacket.

Q.    Well, what else is it based on?

A.    If you came into my store wearing a clown wig, I would

Twisler - cross                                    55

his son also had a pair of sneakers still on his feet, because he did in fact,

did he not, pay for children's shoes, if he, if he did in fact inadvertently

overlook the fact that there was a second pair of children's shoes still on his

son's feet, would it have been shoplifting in your mind?

    A.    He had the old shoes in his cart, and he removed them and

consciously looked for three places to conceal the old shoes.  He didn't

leave them on the floor accidentally, come back, looking around for them.

He picked them out of the cart, went once, twice, and then the third time

concealed the shoes.

    Q.    Okay.  A couple of more questions.

        You said he was uncooperative --

    A.    Yes.

    Q.    -- did you not?

        But each of the people that were involved in this particular

apprehension, if you will, of one of your customers, wrote reports, did they

not?

    A.    Yes.

    Q.    And one of those people is Jena Arena, right?

    A.    Yes.

Twisler - cross                                                      57

I'll be glad to provide copies, or he can get copies from Kohl's. We got

them from Kohl's. And we are going to reconvene, so if there's follow-up

questions by counsel, there...

THE COURT:   How much more time do you need on this

witness?

MR. EVANS:   I think I have about four or five more

questions. And I don't mind suspending till later. I can pick up where I

am, I know where I am.

THE COURT:   Well, let me -- why don't you finish your

cross, and if Mr. Wier has any re-direct, then we can at least rest on this

one state witness.

MR. EVANS:   Sounds good to me.

BY MR. EVANS:

Q.     Assuming there's not any objection from the prosecutor, I

just want to ask you about one portion of that report from Jena Arena.

A.     Sure.

Q.     Is it Jena Arena?

A.     It's Jena. She was a temporary person in our store. She was

a manager in transition somewhere else.

Quartarone - direct                                          110

Q.    This store's not in the mall, is it?

A.    No, it's a stand-alone store.

Q.    Why did you go there that day?

A.    Well, my son had a pair of sneakers that he had on his feet.
And we had gone through the mall, we also went to Target, and the kind of
sneakers that he was specifically asking for is what other kids were
wearing, the one with the kind of zipper-up kind of a sneaker.  And we
were preparing to go to the Billboard convention the following weekend, so
I wanted to get him new shoes and sneakers for that trip.

        We went to Target first, then we went to the mall, went to all
the...

Q.    Concord Mall?

A.    The Concord Mall, right.  And they didn't have the kind of
sneakers that he wanted, I guess what the other kids were wearing.

Q.    Are there more than one shoe store in the Concord Mall?

A.    Yes, several.

Q.    Did you go to more than one?

A.    Yeah, we went to Kids Foot Locker.  We went to several other
stores, went to Boscov's, went to Sears, and...

Quartarone - direct                111

Q.    No zipper sneakers?

A.    Yeah.  And he wants to look cool like any, like all the other

kids, and I remember feeling that way too when I was younger, so I wanted

to please him in any way I could.

Q.    How old is Mario --

A.    At that time --

Q.    -- or was he then?

A.    -- at that time he was nine.

Q.    Okay.  So you decided to go to Kohl's and see if they had

them?

A.    Well, actually, no.

Q.    Okay.

A.    I was in the mall, and I said well, maybe we'll go to Christiana

Mall.  And when I walked outside the store, there was Kohl's directly

across the street from the Concord Mall.  And I said, you know, I've never

been in that store, let's take a, maybe they got it there --

Q.    Okay.

A.    -- you know.

Q.    So that's what brought you into Kohl's?

Quartarone - direct                                        112

A.    Yeah.

Q.    And your experience in the shoe department, briefly, what,

did you find the shoes right away?

A.    Only, they were on display right on the wall.

Q.    Okay.

A.    And that's when he pointed, that's when he, that's when he

was excited about it.

Q.    Full price?

A.    No, it was a sale price on the wall.

Q.    Did you find the right shoe and the right size?

A.    No.  Here's, here's the situation.  When I first entered the

Kohl's Department Store, usually like most stores, i.e., Sears, Boscov's,

Foot Locker, you're greeted with a sales representative from that

department.  In this particular case, there were no sales people in that

department.  And when I observed one gentleman walking through,

because I wanted to get the correct size of his feet, I had tried to wave him

down, and I believe that's on the video, which is not, has not been shown

here, to try to get assistance to measure his foot, and I thought he worked

in that department.

But he went -- I asked for a shoe measurer and, a foot measurer, and he just kept on, he, he went like this (demonstrating) to me, and it sounded like he stuttered or didn't speak proper, and he kept on walking. I went, okay, lovely, so this is a free-for-all, you know, trying to look for his shoe size, trying to find a foot measurer, and I found a foot measurer.

Q.    You mean those slide things that measure...

A.    Those slide things, correct. And it turned out to be, according to the shoe measurer, it turned out to be that he had a size ten foot, and I went, okay. So I went through looking for boxes, a size ten, found them, put them on, they were way too big.

Q.    Uh-huh.

A.    And then we walked over and found one of the children's size. And that's why the reference of me going through boxes, was me trying to find the appropriate shoe size for him.

Q.    So it was a ten, children's ten?

A.    No, adult ten.

Q.    Oh, oh.

A.    And that's why a lot of the sneakers did not fit him.

Quartarone - direct                                    **114**

Q.    Okay.

A.    And then we found a children's shoe sizer, and then it turned out to be he was size three, three and a half.

Q.    Were you only looking for one pair of shoes for him?

A.    No, no.

Q.    Okay.

A.    A dress pair, and sneakers and -- because like I said, we were preparing for the convention.

Q.    You've looked at the film that we've talked about, haven't you?

A.    Yes.

Q.    Before you looked at the film, did you remember that the shoes that he tried on that fit were the ones that were brought out of the box over to you, and that you never even had a box?

A.    To be honest with you, when I went into Kohl's, I was expecting -- well, going to Kohl's was probably the worst shopping experience I've ever had; while shopping, before the event of them approaching me.

Q.    Why?

Quartarone - direct                                    117

A.      Okay.  After we finally got the shoes that Mario wanted, he did not want to part with his old shoes.  He's a type of kid that does not like change.

Q.      Okay.

A.      You know, he wanted to keep his old sneakers.

Q.      Okay.

A.      And the only way that I was able to avoid them was to lose them, number one.

Q.      Lose the shoes or lose Mario?

A.      Lose the shoes.

Q.      Okay.

A.      Okay.  Number one, there's no trash bins in that department, 'cause you can videotape, you can look through that whole surveillance camera, there are no trash bins.  Number two, it is customary when you buy new shoes for children, the sales representative on the floor asks would you like to wear these sneakers out.

Q.      You've had that happen before?

A.      Of course.  We all have had it happen to us.

Q.      Yeah.

Quartarone - direct                                    118

A.      Number two, there was no sales representative that day.  I'm a big boy, I can shop for my son by myself, okay.  However, once he wants to wear those sneakers, I wanted to discard them in a way that he would not find them.

Q.      The old ones?

A.      The old ones.  Okay.

Q.      So you were trying to find a place to put them --

A.      I have to get rid of them.

Q.      -- that Mario couldn't find them?

A.      To get rid of them.  It would have been nice if a sales representative would have been there to take them.

Q.      Did they fit?

A.      Okay.

Q.      Did those old shoes fit?

A.      No, they were, they were fairly tight on the toe area --

Q.      Yeah.

A.      -- you know, but he liked the Velcro feeling.

Q.      Oh, okay.  So he would have kept them forever.

A.      Yes.

Quartarone - direct                               119

Q.      So when you got to the cashier, what did you understand you were doing?

A.      Okay.  My, what my intent was when he left the sneakers on --

Q.      Yeah.

A.      -- was to just pay for them with the other shoes, with the other clothes, and just say, oh, my son's wearing these sneakers --

Q.      Yeah.

A.      -- you know, that was my mind.  But being in that store for over an hour to shop for two pairs of sneakers...  And I happened to walk into the jean department because, wow, there's some jeans that were pretty neat that I can buy.  Now, in reflecting what I saw and observed --

Q.      On tape, you mean?

A.      -- on tape, was when I went into the lock there, the fitting room to try on the jeans, okay, they had security people watching me going into the fitting room, as if I was going to steal...

Q.      Yeah.  But I wonder, what, what was going on with you when you went to the cashier's...

A.      Oh, when I went to the cashier, I mean, Mario was, as you could see, he was running around, even with the cart, their shopping cart.

He was running around with the shopping cart. And, you know, as I was walking up there, I'm looking at him, watching where he's going, you know. Then the lady is starting to ring up, and then I have my, my checkbook out, and then she asked for my license, I took out my license, and then he's talking to me about getting a talking watch, which I never heard of before.

Q.    Mario, you mean?

A.    Mario, yes. And I never heard of a talking watch before, so...

Q.    So you don't really know what he's talking about?

A.    No. So I said, well, we'll go to the jewelry department down there where they sell watches, sport watches, all kinds of watches, kids' watches, you name it. I said once we take care of that, once I pay for that, I'll walk over there. And that's when Mario and myself walked over there to look at the watches.

I then spoke to the person behind the, the jewelry department, and asked if they had any talking watches. They said, no. And then I said, Mario, they don't have it. Then I went to the cologne department to smell some of the cologne. And then at that point, I was, I was getting ready to leave, completely, honest to God, forgot that he had the new sneakers on.

Quartarone - direct                                          121

At that point, I just left the store, opened up the first door, by the time I

was in the, before...

Q.    Where, the space in between the doors?

A.    People surrounded me, okay, and I thought somebody had a

gun pointed at me, the way it felt and...

Q.    When you say that, what do you mean, somebody had a gun

pointed at you?

A.    Well, just the way they kind of covered all around me.

Q.    You thought they were protecting you?

A.    Yeah, honest to God.  Yeah.

Q.    Okay.

A.    I had, I'd never, I mean, I never seen anything like that.

       And then they said, come with us, sir.  So, I followed them.

Q.    Do you remember them identifying themselves as who...

A.    No.

Q.    You went with them?

A.    I went with them, yes.

Q.    Why?

A.    Well, I thought something was wrong.  I thought something,

Quartarone - direct                                            122

they knew that somebody didn't like my radio station or there was a call

that they're going to shoot Tony with the KISS-FM jacket -- I don't know.

You know, we need a...

Q.    You thought you were at risk?

A.    I thought me or my son were at risk, yes.

Q.    Okay.  So then they take you into this, someplace, where did

they take you?

A.    It was an office.

Q.    Okay.  Then what happened?

A.    Okay.  They sat me down, you know, and they asked me for

my driver's license, which --

Q.    Yeah.

A.    -- I gave them.

Q.    Okay.

A.    Okay.  Then they asked me for, they wanted to take a picture

of me, and I said --

Q.    And what'd you do?

A.    -- which they did.

Q.    They did take a picture?

Quartarone - direct                                123

A.    They did take a picture of me.

Q.    How'd you feel about that?

A.    Okay.  Go ahead --

Q.    Okay.

A.    -- you know.  And then I said, what's the problem, and they, he never answered me (indicating).

Q.    Mr. Markson, you're pointing to?

A.    Yes.  He never answered me.  And I said, can you please tell me what the problem is.  Again, he did not answer me.  But the gentleman that testified the last time we were together --

Q.    The guy with --

A.    -- yeah, he was --

Q.    -- Mr. Twisler, the guy with the reddish hair?

A.    -- he was hopping around in and out of the, out of the office --

Q.    Okay.

A.    -- you know, and I don't know what was going on.  And then he (indicating)...

Q.    You're pointing to Mr. Markson?

A.    Yes.  He then took his hands and went like this

Quartarone - direct                                   124

(demonstrating) and pointed to my son's feet, and realized, I went, oh, I

completely forgot. This is what this is about, I'm sorry. I'll be glad to pay

for them, it's no big deal.

      At that point, my son became hysterical. He kicked the

sneakers off his feet and started crying. And I said, really, if this is what

this is about, I apologize, you know, I've never had anything happen like

this before. Then this gentleman here (indicating)...

Q.    You're pointing to Mr. Markson?

A.    Yes. He opened up the side of his desk drawer and he was

looking for a folder with my name, and my name, my last name, to see if I

had a prior warning, or a prior record with Kohl's Department Store; and

I said, no, and --

Q.    Did he make any comment about that?

A.    -- you know, he looked at my driver's license and said, oh,

you're from the Bronx, you, you must have a record. Yeah, I was born and

raised in the South Bronx, in South Bronx.

      And I just sat there, and I was cooperating for a long period

of time. I mean, to me, any longer than twenty-five, thirty minutes is being

more than patient.

Quartarone - direct                                    125

Q.    Okay.

A.    At that point, they found nothing in there, and I said, now

what are we waiting for.  And they says, well, we're going to call, we're

waiting for an answer from our supervisor.  And I said, okay, and I sat

back down, trying to calm down Mario.  The store's office general

manager was asking to take Mario out of the room, because he was

hysterical, crying, and he didn't want to go with them.  During this whole

time, my son is hysterically crying, that something bad's going to happen.

At that point, we're going on forty minutes, forty-five

minutes.  The supervisor supposedly still has not called back, after they

told me that they had paged their supervisor.  At that point, I said, do me a

favor, this is getting so ridiculous, I want the police here.  Because once the

police come and they hear my side -- which that's what I thought would

happen.  I had no idea that the second they got there they would handcuff

me and, and take me off to jail.

Q.    Well, did they talk to you, the police, when they got there?

A.    No.

Q.    Oh. So...

A.    They spoke to them, but not, not to me.

Q.    Okay. And that all took about how long?

A.    Over two and a half hours.

Q.    Including being at the police station and all that?

A.    No. I was at the police station till 1:00 o'clock in the morning.

Q.    So from 5:00 or 6:00 o'clock until 1:00 o'clock in the morning, you were being processed at the police station. I mean, you were first being processed by --

A.    Two hours at Kohl's --

Q.    -- the Kohl's...

A.    -- being there two hours in Kohl's. And then by the time we got into the, the police station, it was almost 8:00 o'clock at night. From 8:00 o'clock at night till 1:00, 1:30 in the morning. 'Cause I had to go on this video TV and speak to the judge on video camera --

Q.    Uh-huh.

A.    -- and --

Q.    That's what the judge looks at (indicating), yeah.

A.    -- and, and --

Q.    Uh-huh.

A.    -- basically plead...

Quartarone - direct                                    127

The whole thing was like a nightmare to me.

Q.     Where was Mario during that?

A.     At this point, Manny was watching Mario.  Mario watched

Kohl's -- the police handcuffed me in their office, and when I hear them

say that they didn't want to cause a racket or, you know, a disturbance in

the store, well, here it is, they're handcuffing me in their office, carrying

me out through the lobby of Kohl's, throw me into the police car, while my

son's screaming hysterical, which they don't show you that on the tape,

while this is going on.  And all they had to do was let me pay the $22.50.

Q.     That's what they were on sale for?

A.     Okay.  Yes.

Q.     Did you have any idea you were walking out of the store and

that your son still had the sneakers on and they weren't paid for?

A.     To be honest with you, after being in that store for almost an

hour of shopping, I wanted to get out of there, and I completely forgot.

MR. EVANS:   I don't have any more questions, Your Honor.

THE WITNESS:   And I...

There is no way that a single parent, especially myself, I can't

speak for the general population, but the things that I have accomplished

Quartarone - cross                                132

Q.    And how long has he asked you for this, these shoes?  When kids ask their parents for weeks or days beforehand if they can get these and want to go shopping, was this the case here?

A.    No, probably the day before.

Q.    Okay.

A.    Because when I mentioned to him that we were going to go shopping for new stuff, that's when he mentioned, oh, daddy, I want the ones with the zipper-up.

Q.    Was he pretty excited about this?

A.    Yes.

Q.    And you stated you, you went to the mall to look for these shoes.

A.    Uh-huh.

Q.    You went to the kids --

A.    No --

Q.    -- store?

A.    -- first I went to Target, is what I said.

Q.    First you went to Target.  And you went to the kid's store, whatever that is?

Quartarone - cross                                    133

A.    In the mall, the Concord Mall.

Q.    In the Concord Mall.

A.    Kid's Foot Locker --

Q.    They didn't have them.

A.    -- Boscov's --

Q.    You went to --

A.    -- Sears.

Q.    -- you went to Foot Locker, Boscov's --

A.    Uh-huh.

Q.    -- Sears.  Then you get to the, you get to Kohl's?

A.    Yes.

Q.    And you're trying on these shoes for probably what, twenty minutes?  You find the right pair, nobody there to help you, you're looking in and out for different shoes or, you know, here, there, it's hot, right?

A.    Yeah.

Q.    You finally found them, you get them; you take the old shoes off, correct?

A.    Correct.

Q.    You put the old shoes in the, in the cart, right?

154

in misdemeanor cases, tell them that they must be firmly convinced of the defendant's guilt. And I'm not firmly convinced. I think people make mistakes. I think the tapes are very convincing, but this defendant, he took the stand, he was credible, and he wasn't impeached. That means the evidence is equally balanced. That means as a matter of law, I must enter a finding of not guilty.

So if there's anything further from counsel, I'll hear it, but I'm going to adjudicate for those reasons, which hopefully, the Court's articulated, of finding him not guilty.

Anything else, counsel?

MR. WIER:    No, Your Honor.

MR. EVANS:    No, Your Honor.

THE COURT:    All right. Have a good day.

MR. EVANS:    Have a good day, Your Honor.

- - - - -

Westlaw.

Not Reported in A.2d

Page 1

1985 WL 552278 (Del.Super.)

(Cite as: 1985 WL 552278 (Del.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Margaret TAYLOR
v.
WOLHAR AND MOORE, P.A.
No. CIV.A. 81C-SE-30.

March 8, 1985.

Patrick Scanlon, Esq., Barros, McNamara & Scanlon, P.A., Dover.

Robert C. Wolhar, Jr., Esq., Wolhar and Moore, Georgetown.

LETTER OPINION AND ORDER

BIFFERATO, J.

*1 Gentlemen:

This is an action for damages for malicious prosecution and false arrest. Now before the Court is Wolhar and Moore's (hereinafter "Defendants") motion for summary judgment.

This action stems from the attempts of defendants, on behalf of Dr. Galifianakis (hereinafter "the Doctor"), to collect a debt of Margaret Taylor (hereinafter "Plaintiff") owed to the doctor for medical treatment rendered. A judgment was entered against plaintiff by J.P. Court No. 3. On May 9, 1979 defendants filed an execution praecipe in J.P. Court No. 3 requesting the constable to levy on all plaintiff's personal property and household furnishings. On May 21, 1979 the constable levied upon plaintiff's property.

On August 9, 1979, defendants, while attempting to

have the levied property sold to satisfy the debt, learned that plaintiff had moved. On September 28, 1979, Lawrence Connell, an associate attorney with defendants, wrote Free State Receivables, a collection agency retained by the doctor, requesting a new address within 30 days or the file would be closed. On October 9, 1979, Mr. Connell swore out a warrant for the arrest of plaintiff. Plaintiff was arrested on August 20, 1980 and charged with unlawful interference with levied-upon property (11 *Del.C.* § 893). The charge was dismissed by the Attorney General's office.

Defendants have the burden of showing that, taking the facts in the light most favorable to plaintiff, no set of facts exists which would hold the defendants liable for plaintiff's claim. *Oliver B. Cannon and Sons, Inc. v. Dorr-Oliver, Inc.,* Del.Supr., 312 A.2d 322 (1973); *Watson v. Shellhorn and Hill, Inc.,* Del.Supr., 221 A .2d 506 (1966).

Both parties correctly point out the elements to the offense of malicious prosecution which are:
(1) There must have been a prior institution or continuation of some regular judicial proceedings against the plaintiff in this action for malicious prosecution.
(2) Such former proceedings must have been by, or at the instance of the defendant in this action for malicious prosecution.
(3) The former proceedings must have terminated in favor of the defendant therein, the plaintiff in the action for malicious prosecution.
(4) There must have been malice in instituting the former proceedings.
(5) There must have been want of probable cause for the institution of the former proceedings.
(6) There must have been injury or damage resulting to the plaintiff from the former proceedings.
*Stidham v. Diamond State Brewery,* Super.Ct., 21 A.2d 283 at 284 (1941).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

1985 WL 552278 (Del.Super.)

**(Cite as: 1985 WL 552278 (Del.Super.))**

Defendants correctly argue that if probable cause existed to swear out the warrant, this action must be dismissed. *See Stidham.* The *Stidham* Court defined probable cause as follows:

Probable cause may be defined to be a reasonable ground for suspicion or belief, supported by circumstances sufficiently strong in themselves as to warrant a reasonably cautious and prudent person in the belief that the person accused is guilty of the offense with which he is charged. *Id.* at 285.

**\*2** In the present case, plaintiff claims that *all* the circumstances would not lead a reasonably cautious and prudent person to believe that plaintiff is guilty. For plaintiff to be guilty, she must be found to have either hidden, destroyed, or removed from the county the seized property. 11 *Del.C.* § 893. Defendants inferred that one of these three things occurred because the sheriff did not have a new address. Defendants' inference was not based on any facts in the case; rather it is based on presumptions made on a cost-benefit basis that, because the sheriff did not have a new address, one of the three triggers in 11 *Del.C.* § 893 was pulled. Plaintiff disputes the reasonableness of this presumption. It is a question of fact whether probable cause existed and if defendants used due care in coming to his conclusion. *See Brown v. Cluley,* Del.Super., 179 A.2d 93 (1962). Facts exist to prove lack of due care, and had due care been exercised, no probable cause would exist. The post office had a forwarding address and the doctor, who had been receiving payments, knew of plaintiff's whereabouts.

Defendants rely on *Padley v. State,* Del.Supr., 102 A. 60 (1917), and *In Re Crimmins Vending Service, Inc.,* Bk. 74-154 U.S .D.C., Balick, J. (Aug. 27, 1975) for the proposition that failing to tell the sheriff of movement of the property is probable cause for unlawful interference.

In *Padley,* the Court found that the defendant moved the property to a place where the "sheriff probably would not be able to find them." *Id.* at 61. The evidence in this case is that the sheriff, or anyone, if they had looked, would have found the property. The fact is defendants did not look.

In *Crimmins,* the court looked at all the circumstances surrounding the movement of property to arrive at the conclusion that the property was moved, without notifying the sheriff, with intent to hinder or delay the creditor. Applying that test here, looking at the surrounding circumstances, there is an open question as to probable cause. That question should be resolved by the jury.

For these reasons, summary judgment is DENIED. IT IS SO ORDERED.

1985 WL 552278 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d

1986 WL 3638 (Del.Super.)

(Cite as: 1986 WL 3638 (Del.Super.))

C
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Stephen Glenn WILSON, Plaintiff,
v
DRAPER-KING COLE, INC., a Delaware
Corporation, Defendant.

Submitted: Feb. 21, 1986.
Decided: March 7, 1986.
Thomas C. Jackson, Terry, Jackson, Terry &
Wright, Dover, Delaware.

Richard W. Pell, Tybout, Redfearn, Casarino and
Pell, Wilmington, Delaware.

*1 Upon Defendant's Motion for Summary
Judgment. Motion Denied.

WILLIAM G. BUSH III, Resident Associate Judge.

Stephen Glenn Wilson (plaintiff) brings this
damage action alleging malicious prosecution and
abuse of process against his former employer,
Draper-King Cole, Inc. (Draper). Plaintiff charges
Draper with maliciously instigating a felony
prosecution under 11 *Del.C.* § 844 (Theft; false
promise) against plaintiff over a dispute about the
payment of an overload fine plaintiff incurred while
delivering a truckload of beans to Draper in
Draper's tractor-trailer.

Draper moves for summary judgment claiming
plaintiff cannot establish the elements of either
cause of action, malicious prosecution or abuse of
process. Of course, plaintiff is not required to
establish the elements of his claim on a summary
judgment motion but rather to show the existence of

a genuine issue of material fact as to each element.
*Moore v. Sizemore,* Del.Supr., 405 A.2d 679 (1979)
. Summary judgment is denied because the
material facts or the inferences to be drawn
therefrom are in dispute as to each element of each
claim.

As gleaned from the depositions and other
discovery material, the following facts are presented
in the light most favorable to plaintiff. Plaintiff
was one of fifty-three drivers employed by Draper.
Draper dispatched plaintiff to H & L Farms (H & L)
in New York State to pick up 450 one-hundred
pound bags of beans for delivery to Draper's plant
in Milton, Delaware. On Thursday, May 5, 1983,
after plaintiff's arrival at H & L, he made a rough
count of the bags which were stacked in a
warehouse. The loading crew boss asked plaintiff
to lunch, and when they returned, the trailer was
over one-half loaded. While it was customary and
plaintiff's practice to be present when the truck was
being loaded, plaintiff assumed since he was going
to lunch with several of the loading crew, there
would be no one to load the truck until their return.
After the truck was loaded, plaintiff received a bill
of lading showing that there were 450 one-hundred
pound bags, totaling 45,000 pounds. Although
there were no scales at H & L, he attempted to
weigh the trailer at two weigh stations along the
return route, one of which was closed and at the
other, the scales were out of order.

While returning to Draper, he was stopped at
Blossburg, Pennsylvania where his load was
weighed and found to be approximately 6,000
pounds over the 80,000- pound weight limit. He
received a fine of $1,200 which he could not pay.
The truck was impounded and he was taken to a
motel for the night until he could arrange payment.
He finally reached Draper the next morning by
telephone and spoke to William P. Dellinger traffic
manager of Draper. Dellinger told plaintiff he
would advance him the amount of the fine, but that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2

1986 WL 3638 (Del.Super.)

**(Cite as: 1986 WL 3638 (Del.Super.))**

plaintiff would be responsible for repayment to Draper and the two would discuss the terms of the loan when plaintiff returned. Plaintiff understood that Draper expected him to repay the amount of the fine but thought this was unfair because it was Draper's load; he suspected Draper of purposely causing the overload; and there was no way he could have known he was overweight based on his own rough count of the bags and the bill of lading which indicated a load weighing 45,000 pounds, well within the 80,000-pound limit. There was no financial or other incentive for plaintiff to cause the overload himself. Draper's policy as to overweight fines was that the drivers were responsible for the fines unless the fine was unavoidable or was not the driver's fault.

*2 Plaintiff went to Dellinger's office early Monday morning, May 9, and turned in the bill of lading and the ticket. Plaintiff and Dellinger did not discuss the bill of lading or how the overload occurred. They discussed repayment of the advance. Plaintiff offered to pay $25.00 a month. Dellinger insisted on $50.00 a week which plaintiff said he could not afford. Plaintiff wanted the agreement in writing. They went to the office of Frank A. Newton, vice president of Draper. Figures were again discussed. Newton had an agreement drawn up for repayment at the rate of $50.00 per week. Plaintiff was told he would not be "dispatched" (given work) until he agreed to the repayment terms. He refused to sign the agreement and walked out of the office.

Later that day, Dellinger called plaintiff's father, trying to locate plaintiff, and warned him that his son was facing criminal charges. Plaintiff's wife attempted to collect his paychecks as she had done on other occasions. Plaintiff was told that his checks would not be released unless he signed an agreement permitting Draper to deduct the amount of the fine from his pay.

The next day Dellinger wrote a letter to plaintiff stating that plaintiff was fired and that if he did not arrange to repay the loan, Draper would press criminal charges. Within the next day or so, Dellinger asked a detective friend, William Dudley, Jr., to have lunch with him. Detective Dudley had

worked with Dellinger on other criminal prosecutions of Draper employees, but none involving money advanced for the payment of a fine. Dellinger told Dudley about the incident with plaintiff and asked his opinion whether the facts as related amounted to theft under 11 *Del.C.* § 844, a copy of which he had with him. Detective Dudley agreed that a crime probably had been committed and offered to swear out a warrant if Draper wanted him to. It was at Detective Dudley's suggestion that Dellinger wrote a second letter setting out Dellinger's belief that plaintiff's actions showed an intent to deprive Draper of the money advanced to plaintiff. The letter also stated that plaintiff's pay was used to offset part of the loan, leaving a balance of $667.91 owed by plaintiff to Draper.

Some days later, Detective Dudley called plaintiff, after discussing it with Dellinger, to tell plaintiff that Dudley had sworn out a warrant for his arrest. Detective Dudley testified that citizens never sign felony warrants. Plaintiff met Detective Dudley at the police station as arranged. He was arrested and taken to Justice of the Peace Court where he was released on his own recognizance. Detective Dudley notified Dellinger of the arrest and told him when to appear to testify. It was Detective Dudley's impression that Dellinger wanted to prosecute in order to recover the money.

Plaintiff had secured an attorney and also filed for unemployment compensation. He was granted compensation on the ground that there was no just cause for his firing. Draper appealed the decision on two levels and each time the referee's decision was affirmed, finally by Judge Tease of Superior Court.

*3 On the date of the preliminary hearing, the deputy attorney general, John Sandy, entered a nolle prosequi of the charge, stating that the matter was better handled civilly, but that there may have been a basis for criminal charges. It was Sandy's impression that plaintiff refused to repay any of the money. Dellinger was angry at the refusal to prosecute and called Sandy later that day to clarify the facts of the case. Sandy told him to call his superior which Dellinger did. The charge was not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 3

1986 WL 3638 (Del.Super.)

(Cite as: 1986 WL 3638 (Del.Super.))

reinstated. Draper did not bring a civil suit against plaintiff as suggested.

In a cause of action for malicious prosecution, there are six essential elements, each of which must exist: (1) the institution of criminal proceedings, (2) by or at the instance of defendant, (3) terminating in favor of plaintiff, (4) brought with malice, (5) without probable cause, and (6) resulting in damage to plaintiff. *Stidham v. Diamond State Brewery,* Del.Super., 21 A.2d 283 (1941).

At issue is Draper's contention that the charge was instituted by Detective Dudley, not Draper, with probable cause and without malice. Draper argues that it did not institute the criminal charge because its actions were not the determining factor in convincing Detective Dudley to commence prosecution. If one merely makes a full and fair disclosure, in good faith of incriminating circumstances to an authority and that authority is left to freely exercise his own discretion on whether to charge a person, then that citizen should not be liable for malicious prosecution. *See Brown v. Cluley,* Del.Super., 179 A.2d 93 (1962). Even if, however, defendant does not make the formal charge, defendant may be liable if he "advises or assists another person to begin the proceeding, ratifies it when it is begun in defendant's behalf, or takes an active part in directing or aiding the conduct of the case." W. Prosser, *Prosser and Keeton on the Law of Torts* § 119 (5th ed. 1984). One is deemed to have initiated the proceedings if "his direction or request or pressure of any kind by him was the determining factor in the officer's decision to commence the case." *Zenik v. O'Brien,* Conn.Supr., 79 A.2d 769 (1951). If one states "I want you to prosecute him," he can be said to have procured the institution of proceedings. Restatement (Second) of Torst § 653 comment g, illustration 5 (1977). In view of Dellinger's relationship with Detective Dudley and of Dellinger's attempt to persuade the prosecutor and the prosecutor's superior to reinstate the charges, the inference can be made that Dellinger was the driving force behind the institution of the criminal charge. While Draper claims Detective Dudley did

his own independent investigation, the evidence supports a finding that the detective's contact with plaintiff was to inform plaintiff of the charges, not to confirm facts prior to a probable cause determination.

The element of malice can be found from the testimony of Detective Dudley and others that the primary purpose of the commencement of the prosecution was to collect a debt. "Malice" does not necessarily mean that "there must exist actual spite, ill will or grudge." *Stidham, supra,* at 285. It is found when defendant's primary purpose is something other than bringing an offender to justice, such as a "prosecution for the purpose of obtaining any private advantage, for instance, as a means to extort money, to collect a debt, to recover property ..." *Prosser, supra,* at § 119, p. 883. It may be true that the money is lawfully owed to the accuser but that relief might have been secured in appropriate civil proceedings. Restatement (Second) of Torts § 668 comment g (1977). Furthermore, summary judgment is precluded since the issue of malice is one of intention which is ordinarily a question of fact for the jury. *Murphy v. Godwin,* Del.Super., 303 A.2d 668 (1973). *See also, Murray v. McLane,* Cir.Ct.Del., 1 Del.Cas. 534 (1815).

*4 As in most cases of malicious prosecution, the key is whether probable cause existed. "Malice may be implied from want of probable cause, not want of probable cause from malice." *Murray v. McLane* at 535. The question whether probable cause existed depends on the "defendant's personal knowledge or information communicated to him of facts and circumstances at the time the prosecution was begun, sufficient to excite the mind of a reasonably cautious and prudent person a reasonable belief in the plaintiff's guilt." *Plummer v. Collins,* Del.Super., 77 A. 750, 752 (1910). *See also Brown v. Cluley, supra.* Since the policy of an employee's responsibility for payment of overweight fines was not set in stone but depended on whose fault it was, a reasonably cautious and prudent person may have attempted to ascertain the facts before conditioning Draper's advance of the fine money on plaintiff's unequivocal promise to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

1986 WL 3638 (Del.Super.)

(Cite as: 1986 WL 3638 (Del.Super.))

Page 4

repay, especially since at the time the promise was extracted from plaintiff, Draper's tractor-trailer as well as plaintiff was being held until the fine was paid. A reasonably cautious and prudent person might have viewed plaintiff's offer to repay at $25.00 a month as a bona fide offer and then would have communicated the offer to the charging authority in such a light. Given plaintiff's offer it could be found that a reasonably cautious and prudent person would have considered the incident an employment dispute or a civil matter rather than concluding that plaintiff, at the time of his promise, had the requisite criminal intent not to repay the money.

Contrary to defendant's contention, the issue of probable cause is not a pure question of law for the Court. "The matter of probable cause for the prosecution is a mixed question of law and fact; the facts to be found by the jury, and the court to decide whether they amount to probable cause." *Wells v. Parsons*, Del.Super., 3 Del. (1 Harr.) 505, 506 (1842). *Compare Plummer v. Collins, supra* (jury charge). When there is no issue of fact, as in *Stidham, supra*, where defendant offered no evidence to rebut the prima facie evidence of probable cause, the court determines whether probable cause exists. But here, there are questions as to "what appeared to the defendant or what he did or did not do;" *Prosser, supra*, at 882, for instance, what information Draper had as to the circumstances of the overload; how other overweight fines were handled; whether defendant saw the bill of lading showing receipt of 450 bags before initiating the complaint; whether plaintiff's offer had the appearance of a good faith offer to repay; whether the demand of $50.00 a week, the firing of plaintiff and the almost immediate threat of criminal prosecution foreclosed any further discussion between plaintiff and Draper; and whether plaintiff's offer was relayed to the magistrate and prosecutor. Since there are questions of fact outstanding as to each element of the cause of action of malicious prosecution, summary judgment is denied.

*5 Plaintiff's complaint also charges Draper with abuse of process. Summary judgment on this cause

of action must also be denied. "[T]he gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish." *Prosser* at 897. The essential elements of the tort are: "(1) an ulterior purpose, and (2) a wilful act in the use of the process not proper in the regular conduct of the proceedings." *Unit, Inc. v. Kentucky Fried Chicken Corporation*, Del.Super., 304 A.2d 320, 331 (1973). Draper insists that the wilful act must be subsequent to the issuance of the process. *Unit, Inc.*, however, relies on Professor Prosser's explanation of the tort and Professor Prosser dismisses the requirement that the improper act must occur after the process has issued. "Most of these cases probably stand only for the narrower proposition that there must be an overt act and that bad purpose alone is insufficient. Thus a demand for collateral advantage that occurs before the issuance of process may be actionable, so long as process does in fact issue at the defendant's behest, and as part of the attempted (improper act)." *Prosser* at 898. There is ample evidence of the first prong-ulterior purpose. Draper wanted to recover its advance and seemed to be unwilling to consider any terms other than those it demanded. If it is found that Draper misrepresented plaintiff's offer or concealed facts, then this may suffice as an improper act in the use of the process. In addition, the circumstances surrounding Draper's attempt to have the charges reinstated—whether Dellinger related to the prosecutor plaintiff's offer to repay—may show subsequent misuse of the process.

For the above reasons, Draper's motion for summary judgment is denied.

IT IS SO ORDERED.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.